Good morning, Your Honors. My name is Ed Joyce, and together with Martin Olbermann, Rowena Parma, and Stephen Plotkin, I represent Morton and Andrea Goldfine, Adrian Goldfine. Goldfine's purchased First Capital Holdings stock, which I'm going to refer to as FCH, through Shearson Brothers, a securities brokerage firm controlled by American Express. After investing more than $4.5 million in FCH stock, the company was put into involuntary bankruptcy by one of its lenders, and as a result, the Goldfine stock became worthless. Shortly after FCM was put into bankruptcy, the Goldfines hired the law firm of Barack Garazano for two purposes. One was to advise them what claims they had that could be pursued against the person or persons who would be And secondly, the engagement was to preserve those claims until they either could be settled or until a complaint could be filed containing those claims. Barack Garazano tried, but was unsuccessful in settling the Goldfine's claims with Shearson Brothers, American Express, and certain of their senior executives. Thereafter, Barack Garazano sought to negotiate a tolling agreement to preserve all of the Goldfine's claims, but the agreement was not entered into and was not in place in time to save the Goldfine's Illinois securities law claims. There's no contest on these facts. The Goldfines thereafter sued Barack Garazano for malpractice, for negligently failing to preserve the Illinois securities law claim. In separate litigation, the Goldfines also sued Shearson American Express and certain senior officers of those firms for fraud, consumer fraud, and other claims which were dismissed on motion in which, after an appeal, dismissal was sustained. I might point out here that the Goldfines were under no obligation to sue Shearson American Express for fraud or consumer fraud. They could have immediately filed a legal malpractice case against Barack Garazano and proceeded on that basis. Now, instead, the Goldfines did file a claim against Shearson. And during the course of these two cases, when they were both pending, Barack Garazano demanded and received an order that precluded the Goldfines from pursuing the legal malpractice case until such time as the Shearson Amex litigation was concluded. It's obvious that trying the legal malpractice case until such time as they could benefit by way of set-off or otherwise from the trial or a settlement of the Shearson Amex litigation. The Shearson Amex litigation was settled in 2007, which was 16 years after Barack Garazano's malpractice caused the Goldfines to lose their Illinois securities law claim. The Goldfines then tried their malpractice case starting in 2010 for approximately two months before the Honorable Dennis Burke, who sat without a jury. At the conclusion of that trial, after hearing numerous witnesses, after hearing Mr. Steinberg, who was Mr. Goldfine's broker, testify for over seven hours, and after hearing a litany of experts called by defendants, Judge Burke concluded that the Goldfines had proved both their case within the case and their malpractice claims against Barack Garazano. The court ordered, as is required under the Illinois securities law, precisionary damages in the amount of $4,506,602, which reimbursed the Goldfines for every purchase of FCH stock except their first purchase, and that purchase was made at a point in time before Shearson American Express took control of FCH. Now, the case against Shearson American Express was settled essentially on the eve of trial for $3.2 million. The total damages that could have been recovered against Shearson American Express was approximately $4,300,000. Judge Goldberg, who had that case, made findings that the settlement was in good faith, and during the course of the illegal malpractice case, the Barack Garazano experts testified that that was an excellent result, was a great result. Again, there's no contest here that of the $3.2 million settlement, the Goldfines only netted to themselves $1,657,000. The difference was paid in legal fees and in costs. They incurred over $900,000 in costs in putting together a case against Shearson American Express. Now, the trial court here, contrary to the ISL and contrary to the only case that is really ever addressed squarely, how you compute damages under the ISL where the plaintiff has received something in addition to rescission because of the fact they own the stock. So that case was Kugler v. Southmark. The case has never been reversed. The statute has been amended numerous times since the decision was rendered. I think there's a presumption here that the Illinois legislature did not want to change the statute. And it's even more obvious that that's the case because both the majority in the concurring decision in Kugler thought there was a better or more logical way to compute damages. But they concluded that that's not up to them. It's not their job to rewrite the statute, which on its face was clear and unambiguous. So you don't believe there's a double recovery? Absolutely not. They've never suggested that. I don't know how they could ever suggest that. As a matter of fact... Your position is that's what the statute requires. It's absolutely correct. The statute requires... Even if you get more, it's what the statute says. That's right, Your Honor. And even the use of the word more, the statute is very precise. It says exactly how you compute damages. The problem that we perceived with the trial court's decision was it took a look at the $3.2 million and did two things we think are wrong. It ignored the fact that the gold fines only received $1.6 million, not $3.2 million. So when they offset the amount the gold fines received, assuming you conclude that was, quote, other amounts, close quote, quote, on the securities, close quote, which we're not contesting, it's what they received. So the offset should have been $1.6 million. Then to compound the problem, even though the Shearson case was settled in 2007, the trial court computed damages as if the money the gold fines received in 2007 had been received in 1988. Now, there's no case anywhere that would support that approach to damage calculation. Even if you read Judge Joseph Gordon's decision in Kugler. Judge Joseph Gordon was arguing, you know, you should stop the interest running on the money you get from a sale of your stock when you get that money. Even Judge Gordon wasn't suggesting that if you got money in 2007, you would apply it back to 1988. It's hard to understand how a good trial court judge made that mistake. After the amount of the precisionary damage is calculated, the statute clearly requires that you compute 10% simple interest from the day you purchased the stock until you are paid by the defendant. The statute is clearly remedial. The intent here is to not give the defendant some incentive to delay or obfuscate. The incentive is to say, look, you're guilty of negligent misrepresentation or fraud. Give him back the money that he paid for the security. Pay him interest at 10% until you do so. And by the way, 10% sounds like a lot of interest today when a Treasury bill is selling at probably no interest. 10% was not a lot of money in 1988. For most of the time this case was pending, 10% reflected the reality of what the market paid. The other point that you can't lose sight of in terms of fairness issues is Mr. Goldfein did not have the use of his money during the longest and largest bull market in the history of America. So if he would have had that money, he certainly could have done more than earned 10% on it. I think it's clear from Kugler that what should have happened is you compute the amount of the rescission, which is $4.5 million. You apply the 11%, which gave you I think about $9 million of interest. You added both of those together and you deducted from that number the $1.6 million that the Goldfeins received. Then you determine what would be an appropriate fee. Under the ISL, a fee is guaranteed. The successful plaintiff shall receive a reasonable attorney's fee. He's not supposed to be out of pocket. In this case, because the underlying case within the case was so incredibly complex, the Goldfeins attorneys put in over $8 million in time to receive, to accomplish the result. When we were seeking a fee from the trial court, we reduced that $8 million down to a little more than five. The trial court looked at the record. He looked at the affidavits. He looked at the law and concluded that a 40% fee, which approximated the contingent fee the Goldfeins had, would be an appropriate fee. We don't contest that a 40% fee is appropriate. We just think it was applied to the wrong case. The 40% fee should have been applied to the amount of the rescission, the amount of the accrued interest, the amount of the reimbursed costs, and that 40% fee would have come out to be around $5 million, which bears an amazing similarity to the $5 million we requested for as a lodestar rate. We've made the calculation just because we did. If you add up the $4.5 million of rescission, which the court concluded we were entitled to, if you add up the $9.23 million of interest we're entitled to, that's $13.7 million. You deduct from that the $1.6 million, and you're down to $13 million, I believe, or $12 million and change. As the Kugler court concluded, it's a clear and unambiguous statute, which to me means that regardless of whether you think it makes sense, whether you think it's fair, you apply the statute, that's what you have to do, and you compute the damages. Now, it's interesting that the damage analysis that we advocate, that we believe is spelled out in Kugler, is the same damage analysis that Derek Farazano used when they filed the motion for summary judgment in 2005. In fact, you can search the record, and no one advocated the approach taken by the trial court. We don't know how the trial court got there. It wasn't something he was urged to do by the defendants or by the plaintiffs. Now, Derek Farazano, we believe, misdescribes the Illinois securities law and tries to convince this honorable court that the statutorily ordered interest payments are prejudgment interest. They may be in the nature of prejudgment interest because no judgment was entered and we're making a calculation from date of purchase to date of payment, but this interest is statutory interest. Derek Farazano looks at TRI-G versus Burke-Fossilman and says, well, in TRI-G, the Supreme Court did not permit prejudgment interest. That's true, they didn't. Because the Supreme Court said in this state, you've got to look to a contract that calls for interest, and there was none. Or you've got to look to a statute, and here there is one. Derek Farazano also found fault with the fact that we were looking for legal fees as called for under the Illinois securities law, and, again, they tried to argue that TRI-G versus Burke-Fossilman did not permit the successful malpractice plaintiff to receive legal fees. It's absolutely wrong. In the appellate court decision, they clearly pointed out that the successful plaintiff was entitled to seek legal fees under the Consumer Fraud Act, and that's a situation where it was discretionary. Our situation is much better for the successful malpractice plaintiff because the fees are mandated. I'd like to maybe make one more comment and then reserve whatever time I have left to respond to Derek Farazano's argument. Derek Farazano argues that the Illinois securities law cannot be looked to in order to determine the appropriate damages for an injured client who's got a malpractice claim. Their basic logic is, well, if the legislature intended that a lawyer would have to respond in damages because his negligence caused the client to lose his ISL claim, the statute should have said that. I don't know of a single statute in Illinois that says, oh, by the way, if your lawyer somehow makes a mistake, you can sue him because you lost the chance to take advantage of the statute. It's inventive, but there's not a single case in Illinois or elsewhere that we could find that supports this notion of a limitation on the ability of an injured client to sue his client for legal malpractice. I have one question. With regards to the issue of the fees and the costs under the ISL, the argument that has been raised by the other side is that they're actually punitive in nature. They're punitive damages. Could you address that? Yeah, I certainly can. The statute makes it very clear that it's a remedial statute. It makes it very clear that the injured investor should be made whole. In other words, he or she shouldn't have the money they're entitled to receive by way of rescission reduced because they have to pay legal fees. You know, to say this was a punitive damage award also misses the entire point. You can get a punitive damage award for violation of the ISL if the facts support it. You don't get it because the ISL says it's punitive damages. The ISL says it's reasonable fees, and it's the actual cost to incur to pursue the claim. Not filing fees, but all the costs of your expert, et cetera. There's just no basis for calling it punitive. Now, there's a statute in Illinois which says you cannot assert punitive damages against an attorney. What we're asserting against an attorney is statutory damages under the ISL. Thank you. Thank you. Thank you. May it please the Court, my name is Barry Levenstam, and together with my partner, Jeff Coleman, and my colleague, Rena Dimitrieva. Can I just ask you to keep your voice up a little tiny bit? It's a big room, and we have to set up a microphone. Right, I understand that. We want to hear you. We represent the law firm Barrick Fairzell here this morning. Mr. Goldfein gambled more than $4.5 million on FCH, which was an insurance company that was heavily invested in junk bonds, betting, particularly towards the end of that period, that Shearson would buy him out at a substantial profit. He lost that bet. He then sued Shearson for intentional wrongdoing. Among the counts that he asserted against Shearson were common law fraud and consumer fraud act counts, both of which were covered by the tolling agreement that my client prepared for Mr. Goldfein. I disagree substantially with the statement that he was under no obligation to pursue Shearson. He did so at great length and at great expense, and he didn't do that as a gift. He did that for purpose because they allegedly had done intentional wrong. And until that claim was resolved, there was a substantial question whether he had suffered any damage, which is one of the essential elements of the malpractice claim. And so in many cases, like the Crockett v. Bartholomew case cited in our brief, this Court has held that there is no cause of action for malpractice until harm is actually suffered. If there's an existing claim that is viable and being pursued, until that claim is resolved, you don't know whether you've suffered harm or not. And certainly his damage assessment in that case, his initial settlement demands, which obviously could have been inflated, were in the nature of $25 million. But his expert reports reflected $16 to $18 or $19 million in that case for fraud. He did sue Barrick Ferrazano on a malpractice negligence theory, no intentional wrongdoing there whatsoever, for never mentioning to him and not preserving this Illinois securities law claim, which I'll refer to sometimes as the ISL. Circuit Court ruled for him after trial, and that's the subject of our cross-appeal. The Court awarded him the $1.3 million that was the difference between his $4.5 million investment and the $3.2 million that he recovered from Shearson in the settlement, plus $2.76 million in interest and $1.64 million in attorney's fees, both under the penalty provisions of the ISL. So his total recovery was $5.9 million from Barrick Ferrazano, $3.2 million from Shearson, which totals $9.1 million, almost exactly twice the amount he actually lost in terms of his investment. But that was not enough for Mr. Goldfein, who is before this Court today demanding another $8 million or so in interest and another $4 million or so in attorney's fees, seeking a total recovery that's somewhere in the neighborhood of $18 million for that $1.3 million that he did not recoup supposedly because he had lost his ISL claim. He rests this extraordinary argument for damages that are certainly aggravated and punitive, $18 million on a $1.3 million loss, and we might even say vindictive in the word of the statute on professional malpractice claims, based on the Kugler decision. Now, Kugler is a decision that talks about how to impose the rescissionary relief of the ISL on a party that has violated that statute. Kugler has nothing whatsoever to do with malpractice, and it has nothing whatsoever to say about malpractice damages. And the General Assembly, when it spelled out who was to be the target of that 10 percent interest rate or that attorney's fees award, specified that it was underwriters, dealers, salespersons who deal in securities. There's no mention of lawyers. There's no mention of negligent malpractice in any shape or form. So you have to keep in mind the General Assembly did not direct an award under the ISL calculated by Kugler's standards against malpractice lawyers. This court, in Conducts v. Nelson, many, many years ago, the opinion was written by Justice Seymour, Simon, so that gives you an idea, said the rescission provision of the Act is a penalty, is a penalty designed to compel compliance with the terms of that Act. And to understand why this all makes sense, Section 13 provides this rescissionary relief against people who violate the securities law, but it gives them an out. It says if they receive notice and are told how much the loss is suffered as a result of their violation, they can promptly repay that plus the interest right away and there will be no further relief. Well, that out, that portion of the statute, an integral part of that portion of the statute was never available to Barrick Farazano. It had never taken securities money. It had never earned commissions. It had never earned margin interest. It had never sold the security to Mr. Goldfein. It was never in a position where it could refund Mr. Goldfein's money and rescind the deal. So the 10 percent interest in attorney's fee awards do not apply directly under that statute. And furthermore, the common law basis that is asserted is just not meritorious. The Weissman case, which they cite, is a divorce case in which this court held that opposing a fee petition by your attorneys in the course of a divorce proceeding will not bar by res judicata effect a subsequent malpractice case because you don't get the same kind of relief in opposing a fee petition. And it made this general statement about the client is supposed to be put back in the position by malpractice fees it would have been in, but there's no examination of that or application of that, certainly not in this context, and certainly not with respect to the statutory penalties that are imposed on other parties in a malpractice case. And the Illinois Supreme Court has held several times that this does not mean identical relief. In the Triji case, the parties came before the court and said, well, the punitive damages that the jury in the malpractice case said we would have won in the underlying cause should be compensatory to us because we would have that money right now. And the Supreme Court said, well, they may or may not be, that may or may not be the case, but we are not awarding punitive damages in a malpractice case against lawyers. And furthermore, in that same case, the plaintiff argued that the jury found a judgment in the lost case would have been entered on a specific date, and from that date until the date of collection, he would have been earning by statute 9% interest under 5213.03. And the Supreme Court said, well, let's look carefully at that statute. It doesn't say anything about hypothetical judgments. It doesn't say anything about malpractice awards. We limit that statute. We read it narrowly to apply, and so although it may be the case that you would have gotten that 9% if you had won that case and not received payment during appeals or whatever had followed, we're not going to award that against a law firm. Another case, which they don't mention but we cited in both of our briefs, is the Eastman v. Messner case, and this is an important case, too. In this case, the lawyer, through malpractice, lost his client's claim, personal injury claim, and the client had made a partial recovery through workers' comp and then lost the claim against the wrongdoer, sought complete relief of damages against the wrongdoer. And the Illinois Supreme Court said, no, you're not getting that complete relief, and your employer is not going to be able to recover, but it would normally take a lien on out of your recovery. And the court said specifically, an attorney who commits malpractice cannot be considered the person liable for the employee's injury or debt. Well, by the same token, the Barrick firm may have committed malpractice here, but it is not the securities firm, and you do not levy against it the damages, the 9% interest in attorney's fees that you would have levied against the wrongdoer that violated the statute. And one more point on that. Isn't that a causation issue? Well, I believe that that's an outright damages issue. I think you don't get those kind of damages. I don't know what an outright damages issue is. I know what a causation is. Well, I think basically what it is is a policy decision by the Illinois Supreme Court limiting your common law recovery on a negligence claim against a law firm. So I think that's the basis of the Supreme Court's decision-making there. They didn't say that. Well, I think they did exactly in TRIG, and I think that's basically the essence of Eastman II. In this case, Delaney v. Happel said you have to apply this ISL very narrowly because it's in derogation of the common law. And so they didn't extend the right to recovery from the purchasers who are named in the statute to the assinees. This point about the penalty that you asked, the punitive damages conducts, as I just said, specifically recognizes this is a penalty, this rescissionary procedure, that it is designed to coerce securities dealers, people in the securities interest, A, to follow the statute in the first instance, and B, to make good on violations as promptly as they can when they do. The fee shifting. Well, wouldn't that be more in line with maybe a warning or an inducement to the parties to resolve this issue before it gets to litigation? Well, that's an element that's both. Not to violate, and then if you find yourself a violation, yes, absolutely, and that's why 13C gives them the out I discussed earlier, which we didn't have. We weren't in a position to rescind anything. The Illinois Supreme Court in Florman v. Holtzman characterized the fee shifting as an additional punishment, the fee shifting aspect of the ISL. And this court repeatedly in Gowdy v. Richter and Martin v. Orvis and other cases have noted the penal nature of the ISL and, in particular, the fee shifting. Now, as we indicated earlier, 735 ILCS. But does it allow, I mean, to interrupt you, but doesn't Gowdy also say that the intent is to bring the parties back to status quo with regards to the provisions? Well, again, in general, it does. But there, Gowdy is, again, it's a securities case, not a bail practice case. So what I'm saying – But again, in Gowdy, doesn't the court say that although it may appear to be penal in character, right, but the ultimate intent is to bring the parties back to status quo? Well, yes, it does. It doesn't say it may appear. It says it is penal in character, and the point being to force the securities dealer who's run afoul of the law to comply with the law. So, you know, I agree with you, except that it is clearly a recognition of the penal character. Now, even if the ISL interest applies, Mr. Goldfein failed to prove the amount. And here we come to what I – the causation aspect of this, I think, Your Honor. And that is the 10 percent interest would end on the date that the ISL judgment entered. And his expert on the securities law testified that that would have happened long ago because the ISL is an easy claim to prove and it would have been very easy. It's not quite so easy when you demand $5 million in attorney's fees to have established it, but it's – nevertheless, it would have happened quickly, but he couldn't say when. He couldn't even give an estimate of when that judgment would have entered, as the jury found a judgment entry date, a hypothetical judgment entry date, and tried. And so he didn't say when that cutoff would be. Now, they said in their brief that there might not have even been a first appeal in the Shearson case. Well, that's 10 years before, in 2000. That would be 10 years less of 10 years' interest. So they did not prove the amount of – even assuming this applies, and we don't conceive that, they did not prove the proper amount of interest. It certainly didn't run until the date of the malpractice judgment. So are you suggesting that we should follow their expert's testimony or the statute? Well, I'm about to get to that point. What I'm saying is you should deny all 10 percent interest, all the interest, because they did not prove an amount, a date of the cutoff, so they did not prove when the interest would have stopped accruing, and they did not prove what the appropriate actual amount of interest they would have recovered if they had prosecuted that claim would have been. But now I'm turning to the point you just brought up, which is the fact that the judge – there was a basis in the record for the judge's conclusion of how the judge calculated interest, and although we don't think it's correct because we don't think it should apply at all, he based his conclusion specifically on Mr. Goldfein's expert on securities law, Mr. Morano, who testified not once but twice specifically that you take off the amounts before you calculate the interest. The judge asked him about how to calculate the interest, and he said you take the total amount, you subtract from that the amount received, and then you put the 10 percent interest on it. And after that, Mr. Goldfein's counsel asked him again, and he said exactly the same thing. Was the question the judge asked the expert related to the statute? Yes. He asked how do you calculate this interest, how do you apply the 10 percent interest under the statute. Under the statute. Under the statute, yes. And under the Supreme Court's decision in McMath, which we've cited to this court, we think they're bound by that calculation. You know, as a practical matter as well, if you start saying, well, he was wrong, their expert was wrong about how something as fundamental as how you calculate the interest under this securities law, what else was he wrong about? You know, maybe the trust the judge placed in this expert was completely wrong, and it needs to be retried on that basis. So it's not just an easy thing to say, ignore what my expert told the court on that one point. This expert also, by the way, testified that I think that there were no punitive damages allowed under the ISL, which I believe to be the correct result. But there were a number of points in this. You can't simply walk away from that. They're bound by their expert's testimony on that regard. And certainly you can't criticize and undo the trial court for relying on what their expert told them, not once but twice, under oath. And finally, we think the court was within its proper grounds, given that this is not a statutory case, but it's a common law negligence case, to deny 10 percent interest on the $3.2 million that Mr. Goldfein recovered as a result of the claims that were covered by the tolling agreement that my client provided for him. I think that the court was within its discretion in setting that factor up. You know, as for the set-off, they don't like having subtracted the $3.2 million in its entirety. We think that the court was correct that there's no law anywhere that says that there is a basis for such a set-off. And we also feel on the fee issue that the court exercised its discretion properly. It knew about the McNiff case and cited it even. So if you get to that point, and obviously we don't think you should, because we think attorneys' fees are punitive, like the 10 percent interest under this statute. But all of this, I think, is putting the cart before the horse, because, as we argued on our cross-appeal, there are several reasons why you don't even get to liability. The liability was not established as a matter of law. You know, once again, turning to the convex case, the securities law is intended as a shield for the innocent and not a sword for the investor who, because of the speculative nature of venture or his own poor business judgment, fails to reap the expected returns on his investment. And as I see this case, the ISL is being wielded as a sword against my client. The law is clear, and this is as a matter of law, that friendship or prior experience with a broker in the absence of a fiduciary relationship does not excuse a sophisticated investor, like Mr. Goldfein clearly was, from exercising due care for his own financial safety. The Tirrapelli case of this court is quite clear on this point. We also cite the federal cases of emergent capital, where the broker relied on the person relied upon was a former college roommate, Ann Ashland versus Morgan Stanley, which we think is a very, very almost eerily parallel case on its facts. Mr. Goldfein specifically declined to engage Steinberg and Shearson as a fiduciary, and he did not pay them an investment advisor fee, as this court noted in the Shearson appeal. So as this court held in central states, he cannot act with his eyes closed to the available information. And there was, by February and March of 1990, very, very substantial information in the public. In January, the junk bond market had basically collapsed, taking first executive with it and dragging first capital down first. Even if you credit the notion that there was some confusion in the early days between those two organizations, by a month later there's clearly no confusion. There's clearly justification based on the extent to which first capital, in its own right, had junk investments. And that was made perfectly clear in the March Wall Street Journal article. That is in the record as Defendant's Exhibit 57, talked about their first capital's bond portfolio being, quote, underwater at great length. And indeed, the very next day, Mr. Goldfein sent a letter to FCH demanding a seat on its board of directors, and that's DX-59. Shortly after that article, he received the 1989 annual report. This was March of 1990, which demonstrated, which showed, if you look past the opening of it, that 36, 38 percent of the investments were in troubled bonds of that company. And nevertheless, the next month, in April of 1990, he signed a letter telling Shearson, assuring Shearson that he was aware of his investments and they followed his desires in terms of his investment strategies. He claims in his brief to have ignored the details buried in the annual report and to have simply read the CEO letter. But the law is clear here that you're charged with knowledge of the information sent you. And in Sears v. Glasser, the Seventh Circuit has noted that these CEO letters tend to be puff pieces, little advertisements, and that the financial data that follows them is what you need to look at. If you exclude the February and the August 90 purchases, that's over $2 million, which is more than the difference in the settlement between Shearson and the 4.5 and would result in zeroing out the damages if you exclude only the August purchases. And mind you, keep in mind, this is $1.3 million he spent on this stock in August of 1990. After all this information with the junk bonds came, when the stock was at such a low point, it was something like 80, 85 percent of its recent high, itself a red flag. We also point out that he never established malpractice causation. He never demonstrated how specifically having that ISL claim would have changed his fortunes, would have made for a different settlement than the one he got from Shearson. He accepted that $3.2 million and signed a release saying that he was releasing all claims, not only that he had, but that he ever had, ever had, specifically included in that. And so it's our position that any payment on this would be a double release, double recovery on the release. But even if not, the reality is that the trial court gave him trial victory damages, 100 percent trial victory damages. Shearson, in the real world, would never have settled for $3.2 million of all of its claims but the ISL and then taken him to trial on the ISL. It just never would have happened. And so he wound up getting a result that was better than he would have achieved in the real world and the Illinois Supreme Court in the Eastman case says that's error. No one ever testified how much more he might have recovered in damages. So it is clear that he had to prove as quantitatively, although there's always some element of speculation in these cases. The case within a case is always involved some speculation. You have to be able to say specifically what difference this would have made. The trial counsel challenged him before, during, and after the trial to demonstrate specifically what he was talking about and that evidence was never heard. Counsel, I'm going to give you a couple more minutes. Okay. Thank you very much. I just would like to point out then that at the bottom, it is also the case that Barak Farazano actually did not lose, according to his testimony, Barak Farazano did not lose this claim for him. He said under oath repeatedly that the first time he ever heard about this cause of action was when he went to Mr. Plotkin's office in October of 2003. And shortly thereafter, within the six-month period, they issued notices under the ISL. The ISL itself says that you need to have knowledge of the voidability. And there are many Illinois cases, several of which we cite, that talk about how you actually have to know that you have this right. Webb v. Damisch is one. And Martin v. Orvis, Gowdy v. Richter, all these cases talk about needing to know. Nevertheless, when his claim, which he did assert, was dismissed for lack of specificity, he refiled it without putting in all of the explanation about this letter from March 16, which this court in the Shearson case used to say he clearly had consulted counsel and he clearly knew. Well, that letter he confessed at trial he had written is basically a bluff against Shearson. He had not consulted counsel, and he had never heard of a right to recovery under this statute. Nevertheless, he made no effort to expand upon this. And in the end, what the Illinois appellate court held was that he did not provide sufficient facts demonstrating why he didn't know about this claim before October of 1993. And the law is clear. If a claim still exists when successor counsel takes over, the predecessor counsel cannot be tagged for the loss of that claim. So for all those reasons, we would ask you to reverse judgment, I think, for failure to prove it, or in the alternative, reject the appeal of Mr. Goldberg. Thank you. Thank you, counsel. Counsel, you have a couple of minutes, all right? Thank you. Let me try and get through this more quickly than I planned. I want to start by reminding this panel that Barrett-Ferrazzano has not challenged the malpractice, the acquitted malpractice. All they're really doing is trying to figure out some way to keep the damages down. Justice Gordon, you asked me when I first stepped up whether there was a double recovery here, and I want to be sure that I answered your question clearly. There's no double recovery because Barrett-Ferrazzano has been given credit against the judgment for the monies the Goldfines received from Sherson. So there's no double recovery. And then I want to jump to this point about Mr. Goldfine's attorney, Robert Plotkin, failing to preserve an ISL claim. And these facts are not really in dispute. Mr. Goldfine goes to see Mr. Plotkin and engages him to pursue his claims against Sherson and others. Plotkin says, gee, you've got an ISL claim. Did anybody ever tell you about that? He said, no, I never heard about that. So Plotkin includes an ISL claim. Probably he should have put some more facts in. Judge McGann dismissed that count and said, you can come back here with more facts, but I want to warn you, I'm going to sanction you if you come back here and you haven't got the facts. So Plotkin then starts to write the brief, sends the brief to Barrett-Ferrazzano, and as we point out at page 74 of our response brief, Plotkin has a conversation with Ray Reisner, the attorney at Barrett-Ferrazzano, trying to find some facts that would help him salvage the ISL claim. What does Reisner say? Reisner testifies in October 19th. I'm sorry, this is Reisner's testimony at trial. In October 1994, he met with Steve Plotkin, one of Goldfein's attorneys in the underlying case, and informed Mr. Plotkin that he had advised the Goldfeins in August 1991 of the existence of their ISL claims and urged them not to serve a rescission notice. So here we have Barrett-Ferrazzano complaining that Bob Plotkin, in effect, didn't lie to Judge McGeehan. That is absolutely outrageous. And they also misdescribe in their brief what the Illinois appellate court ruled with respect to the ISL claim. The Illinois appellate court made it clear that there were two reasons it was sustaining the trial court's dismissal of the ISL claim. It's at page 27 of the slip of the pen. They say, quote, we agree in both aspects. First, Goldfein's May 16th letter clearly indicates that he was aware that he had a legal recourse against the Shearson defendants, which even under Lennon and Fisher would commence the running of the six-month notice period. Second, Goldfein's bare assertion that notice is timely does not make it so without factual support. The Illinois appellate court didn't say we're dismissing the ISL claim and sustaining the trial court's dismissal because of a failure to plead facts. It said there's two reasons. One, your May 16th letter clearly shows you knew enough for the statute to start to run. That's exactly what Mr. Riesner testified during trial. They talk about the fact that one of Mr. Goldfein's experts in the underlying case originally had an opinion that the loss he suffered was between $16 and $19 million. That was a theory, an economic theory that said if Mr. Goldfein received the money back, he should have gotten away with rescission. He could have invested it in this fabulous bull market, and he would have earned $16 to $19 million. Unfortunately, no court has ever accepted that theory of damages. So although we had an economist say it, it was never presented to a court because courts just didn't buy that approach. We've also been told, you've also been told, that it's punitive and vindictive on the part of the Goldfeins to request a statutory remedy. They were denied by Eric Ferrazano's admitted malpractice. It cannot be punitive or vindictive for a client to say, I would like the benefit I would have had but for your negligence. Counsel, you're going to have to wind up. I said you're going to have to wind up. Can I just go to the end? I just need a minute. I'm holding you to that. Judge, you said earlier you'd give me a little more time. I'm trying to do it. When you go to the approach being taken by Eric Ferrazano, they say there are four documents, four documents that control the outcome of this case. These four documents demonstrate that Mr. Goldfein did not have reason. So they start with an article written by a staff writer for the Wall Street Journal. It was written on March 12th. That was after the February purchase they complained about. And this article was supposed to scare the devil out of Mr. Goldfein. Well, here's what the article says. That the people who ran First Capital bought better junk than others. It also said that the market in junk bonds collapsed, not because of First Capital. And it even hurt conservative junk bond investors like First Capital. Then it goes on to say, well, that the market price for some of the First Capital bonds is $400 million less than they paid. It doesn't say this made First Capital even close to being insolvent. What it said was if they chose to sell those bonds today, they would get back $400 million less than they paid. Most people in the insurance industry hold bonds to maturity. If you bought Treasury bonds on certain days, you would have a significant loss because today's price for the Treasury bond is less than you paid. If you hold to maturity, you don't lose a thing. Now, what does the President, Chairman of the Board of First Capital say? He thinks that most people who invest in companies like his have the long view. They don't make a decision based on one day's market price. He also pointed out that First Capital is controlled by Shearson. So I'm going to have to stop because we have read our stack of stuff, I promise you. Your Honor, I just did it to excite my own patience. I know, and you should. And if you have any questions at all, I'd be happy to answer them. If not, have a wonderful day. Thank you so much. Thank you both. Really, really well argued and well written. I'm pretty certain we'll make this an opinion. Thank you very much. So we'll have something else other than Kugler. Thank you very much.